Very good. Then we'll hear argument in United States v. Perez, No. 19-620. Good morning. May it please the Court. Yongchun Lee, Federal Defenders of New York for Appellant Javier Perez. The Supreme Court in Heller ruled that the Second Amendment codifies a preexisting right to possess firearms and indeed elevates above all other interests the right to use arms in the defense of home and hearth. Heller explicitly linked, in fact, the Second Amendment right to what it called the, quote, inherent right of self-defense. I think inherent there means some sort of a natural right to self-defense. And we respectfully submit that the millions of undocumented immigrants like Mr. Perez have the inherent right to self-defense, just like the rest of us, and that the law that bars them from effectively exercising that right by preventing them from having a gun under any circumstance, including at home for the purpose of self-defense, violates the Second Amendment. So we're using a sort of, I gather, a sort of intermediate scrutiny test here? Well, you know, this Court usually uses intermediate scrutiny.  But we, you know — I don't know of any case that has said it's strict. No, I do not, Your Honor. But, you know, I would say two things to that. One is that this issue is sort of at play in the Supreme Court in the pending case appeal from the circuit, the challenge to New York City's regulation about transporting firearms to fire ranges and stuff like that. And so if the Court is, you know, inclined to just use intermediate scrutiny, I would ask the Court to at least hold off on that because the Court may decide, because at issue there is that one of the plaintiff's But there's a possibility that the Court might say, and this is, again, this is what the Petitioners have argued there, that the lower courts have treated the Second Amendment as sort of an orphan right and not accorded it the right that it deserves. And so we do submit that strict scrutiny should apply because it just — that's what happens when a law abrogates completely a fundamental codified right. That's what happens with all other fundamental codified rights and should apply to the Second Amendment as well. So if we were to agree with you — oh, actually, let me let you proceed. No. So I'll begin by, you know, addressing, first of all, the question of whether Mr. Perez is protected by the Second Amendment at all, and then proceed to why, and to explain that he does, and then to explain why this law violates the Second Amendment under either form of heightened scrutiny. So the amendment says that the Second Amendment states that the right of the people to keep and bear arms shall not be infringed. The people is the key term here, and Heller itself said that this was a term of art. And so — and Heller explored, well, what does the people mean? And then it's segued to its earlier decision in Verdugo's. Let's accept the fact that, at least the time being, I know the other side may be arguing differently, that he is a member of the people. Okay. And, I mean, you know, also — I'm sorry, Judge Walker. Could you get closer to the microphone? Sure. I was suggesting that perhaps we skip over the argument about the people for a minute to focus on what concerns me, which is the justification, assuming that he has the right, and what is the government's justification, which you don't think is — is sufficient. Sure. I think that, you know, our view is that, at bottom, this fails any form of scrutiny because, you know, it's just based on the assumption, the prejudice, that undocumented immigrants with longstanding ties to the United States — Well, you know, I think that the arguments can be made that we have people who are in the country illegally, so they have shown disregard, some disregard for our laws. Secondly, that they are subject to deportation, and it's not — and for law enforcement purposes, it's not terribly advisable to know that you're — it's not good to know that when you're going after a person to deport them, they may be armed, and that they have a right to a gun. And that also there's this whole aspect of — of the difficulty of — of tracing the arms and — because these — these undocumented aliens are in the shadows. Why isn't the combination of these various — this various — these various attributes sufficient to justify the act? So two ways to answer that. First is that, again, we think it's strict scrutiny that applies, and therefore — Right. I understand that. At least restrictive means of achieving a compelling end. And I think even the law's defenders would agree that it's sort of over-inclusive and — and also under-inclusive in some way. So under strict scrutiny, I think it would still fail. But under intermediate scrutiny, I — if I may address each of those — Yeah. Those three — three reasons. So the first — first is this notion that, well, you know, these people have — they're not law-abiding. They've already violated the law. Respectfully, that sort of is just rehashing the — the point that we've already — that Your Honor has said we should skip past, is whether they're part of the people. And I think that if we agree that through historical textual analysis that aliens or immigrants are part of the people, then the question is, well, what — is — is this sort of some — are they — are they still somehow non-law-abiding enough for us to deprive them of this right? Well, let me just — let me just interject, if I could. You know, in Jimenez, we acknowledged that there is a — that 922 — 922G creates special risk groups or identifies special risk groups and ties the possession or makes the possession by those risk groups a special category, right? And — and that's kind of the — for  Yes. No, no. So we've kind of acknowledged and validated that notion without great scrutiny, without great analysis, and certainly without data, acknowledging that the act was passed in a hurry and so on. But I'm having difficulty seeing how the analysis here should differ from the analysis adopted in Jimenez. Jimenez just — you know, the holding of Jimenez is simply that, well, that guy who was dishonorably discharged for felony-level conduct is really just a felon. And, you know, just the fact that his felony came through a court-martial rather than a court shouldn't make any difference. And Heller itself says that whatever we say about the Second Amendment, right, we're not questioning a law banning felons and the mentally ill. But you've argued that the ban of — of gun possession for undocumented immigrants is overbroad and overinclusive. And similarly, you can make arguments about that with regard to felons and people who are subject to dishonorable discharges. But we were willing to accept those broad categories given the importance of regulating guns to the State. Yes, Your Honor. But I think — respectfully, I think that's because he's essentially a felon, and Heller carved out felons as not deserving of Second Amendment rights. And respectively, you know — Well, Heller did, and it's also in the — one of the listed items in 922G. But this is a Subsection 5 case. Yes. And that was a Subsection 5 case, right? Jimenez? Jimenez. Jimenez was about — it was either — I can't remember, but it was about dishonorably discharged veterans. Oh, that was — 922. Different, yes. Yeah, different. So the point I want to make about law-abidingness is that, you know, it's not a self-defining term. Like, you know, someone who has a lot of speeding tickets or someone who, you know, it depends how you define it. And we wouldn't — But it's tied in with the whole notion of the fact that, as a general matter, the undocumented alien doesn't want to be found out, wants to keep things secret, knows that they're here illegally. And therefore, if they know that they're here illegally and are living with that, why isn't that a sufficient basis under intermediate scrutiny for the government to say, you shouldn't — you shouldn't carry out firearm? I understand. Yeah. I think that that is the — that's the government's strongest argument, I think, that the Court's pointed out. And, you know, again, two responses. First, we think strict scrutiny should apply rather than intermediate. And then second, in some ways, that argument almost begs the question or is circular in that it's saying that, well, you know, just the fact of undocumented status means that you are someone who sort of shouldn't be trusted with guns, because, well, after all, you're undocumented and live in this sort of secret world. And that's, to me, just assuming, again, the very — the conclusion that we're arguing about is whether the amendment protects immigrants. You're potentially — you're potentially subject to physical seizure, placing potentially law enforcement — That's the first argument, this idea that, you know, immigrants are subject to removal. And so our argument about that is, well, that's both grossly over-inclusive and under-inclusive. Over-inclusive in the sense that, I mean, even lawful immigrants are subject to removal. And even I'm a naturalized citizen, I could be, you know, denaturalized if I'm subject to removal as well. And so it's grossly over-inclusive. Over-inclusive. And it's also under-inclusive just as a factual matter, because we know that there are, you know, 11, 12 million undocumented immigrants here, and 99.99 percent of them never face removal proceedings. And so it's a justification that's over- and under-inclusive. Do you think the government should be put to producing additional evidence, data evidence regarding the use of guns by undocumented immigrants before we sustain them? Under — under intermediate scrutiny, the government can't just get away with what this Court calls shoddy data or reasoning. There is no data here. In fact, what the data is, it helps us, which is that undocumented immigrants are no more unlawful apart from their immigration status, right? They're no more likely to commit crimes and certainly no more dangerous, more likely to commit violent crimes than anybody else. Is this a facial or an as-applied challenge? Well, because of what this Court said in Jimenez and after reviewing this Court's precedent, it was brought as a facial challenge. But I think that the only thing that's available to us right now is a — is an as-applied challenge, that someone like Mr. Jimenez, meaning someone with an undocumented immigrant with longstanding ties to the United States, whether he — whether the — applying 922g5 to him violates — He was — I mean, there's video, I gather, of him firing in the air. Yes, Your Honor. In the context of a street altercation. Yes. Which is not exactly like being in his home defending himself. No. Yes, Your Honor. I understand. But legally, that's irrelevant, and it's irrelevant for the constitutional analysis for the simple reason that the statute that we're looking at is a gun possession. The act of possession is necessary and sufficient for conviction under the statute. And so the fact of how he used a gun is irrelevant legally under the statute. And so if you look at his allocution, his guilty plea allocution, he simply says that he possessed a gun. And so — and this is how this Court's cases and other courts have treated an as-applied challenge in this context. I think the Seventh Circuit case, the defendant pointed a gun at somebody, and there's a — maybe the Fifth Circuit case, the defendant had a gun in a trunk with a bunch of silencers and burglary equipment. And then Jimenez itself, the defendant was in the process of — was helping someone illegally sell a gun. And Heller said that, again, Second Amendment doesn't affect those kind of laws, laws that regulate the sale of guns. But none of — but the courts in all these cases did not take into account the specific conduct in evaluating the constitutionality of the law. Very good. Okay. You have two minutes of rebuttal, and we'll hear from the government, please. Thank you, Your Honor. May it please the Court, Kevin Trowell for the United States. As my colleague and friend describes his client's as-applied challenge, it is an effect — a facial challenge. And I think that's the question, that's the issue that the government is trying to address in the first portion of its brief. This case, in the government's view, is not, in fact, about whether Mr. Perez has the right to possess a handgun in his home for purposes of self-defense, because that is simply not what happened here. And Heller itself proceeds from the premise that the right under the reason that we are here in the first place is because Heller says there is a limited Second Amendment right to possess a firearm for specific purposes. And it's for that reason that this court in Bryant, for example, found that you are not entitled to possess a firearm in your home in connection with a drug crime, because the drug crime is not a lawful purpose that fits within the scheme set forth in Heller. So I think at the threshold, what we're talking about here is an absolute dearth of facts. As he describes his client's as-applied challenge, he is describing every person convicted under this statute. That is not as applied. Well, you know, I have to say that there's an absolute dearth of facts also with regard to this legislation, to 922G. I mean, the category — we've acknowledged in past decisions that it was kind of passed in a rush in response to certain public events, terrible events, and that there was very little discussion. The committee reports are wanting. And usually on intermediate scrutiny, we look for data. We've required the reproduction of data in the past to support gun legislation. Judge Cabranes did so in the State case, I think, with regard to certain elements of the legislation that had been passed. But I think it's more than just our speculation about why Congress might have chosen to make possession by these categories, and this particular category of individual illegals. It's — look, it is so broad. Sure. I think the first answer to that is you don't need to reach that question for some of the reasons we just discussed. I don't think there is even a factual record here for the Court to address Mr. Perez's challenge. But if the Court were to reach the question of scrutiny — actually, let me say one more word about that. In Jimenez, the reason the Court didn't address conduct and characteristics is because in that case, it raised — potentially raised difficult questions concerning the scope of the right. He was a citizen. He possessed a bullet in his pocket. It would have required an analysis of how far Heller's right extends beyond the home. The government submits on this case, either there are no facts in the record because what we have is a bare-bones allocution, or at most we have a sworn complaint and the video that broad daylight on a city street, clearly not protected by Heller. However, if the Court reaches the question of scrutiny, I think the Judge Cabrera's decision, Your Honor, just referenced, there certainly the evidence adduced was sufficient. It's not necessarily clear that it's necessary. And although in general the Court has required in intermediate scrutiny that the rationale match the purpose, we have six — six circuit courts that have addressed this question. Three have rested on scrutiny. Jimenez rests on scrutiny. And those cases — But there's no — there's no data. I mean, there's no — Correct. — well, detailed study. People are looking to common sense and speculation and some of the factors that we've been discussing about whether violence would be more likely or not with this category of individual, right? Or — no, I don't think that's the rationale. I don't think it's whether violence is more or less likely among unlawful aliens. I think, as Judge Walker pointed out and as we point out in our brief, there are — the compelling — there's no question there's a compelling interest in law enforcement, gun safety, so on. So in a broad sense, firearm regulation is a compelling interest. From there, you move to the fact that these are people who are not traceable. There is a separate prohibition on selling firearms to them. It's illegal under New York State law to possess an unregistered firearm. The challenges attendant to that are doubled when the person who is possessing it is also untraceable. So all of those things together, the government can't dispute that there is not data in the record of these acts in the 1960s linking gun possession or violence to unlawful immigrants. But in the government's view, there's no case that requires that under these circumstances. And here, as a matter of common sense, to permit a class of people who are compelling interest in tracing would just simply defeat that overarching purpose. Kagan. You say there's no case requiring it, but generally on intermediate scrutiny, doesn't the government have to — has to support the regulation? Oh, of course. What I mean is there's no requirement. And we did. In the Judge Cabrera's decision, there was one category, I think, with regard to one — one type of firearm that he remanded on in looking — looking for support for the regulation. What I'm — what I'm taking issue with is not that we need a rationale. Of course, the government needs a rationale and it needs to be linked. But you had asked about data. Data, yeah. And so — Just on the tracing point, I take it that what you're saying is that when a gun is used in a crime and it's found and it has a registration stamp on it, we know — we know what the — what the make of the gun was, and from that, we can figure out who the manufacturer was. That is not enough. We need to find out — go to the manufacturer and find out who they sold to. And eventually, you're saying it ends up in the hands of somebody who can't be traced. And therefore — and then it may have gone through that person to this person. So we're not sure, you know, whether — how the person got the gun. Is that what you're saying? Well, I think this case — the facts of this case are an illustration of the problem. Here, you have, in July, a shooting. And you have a video turned over to police four days after the shooting in July. Right. There's an individual firing a gun in broad daylight on a Brooklyn street. Only through happenstance did the government end up recovering that firearm months later in a separate shooting, and then — only then could they work backwards to the person. There are a host of problems attendant to crimes committed by unlawful aliens, and I'm not suggesting — I don't think this is in any way intended to — No, I'm just talking about the tracing regime. Yeah, but I think those two issues are linked, because the traceability of the person and the traceability of the firearm, it compounds the problem. So I agree with you that, yes, the problem that you've identified, Judge Walker, is the one the government's identifying. That issue is compounded by the untraceability of the person. And I think it sort of doubles the problem and amplifies it, frankly. And in a case like this, where you have possession by an untraceable person, potentially it's being passed around — That's more specific, it seems to me, than just the fact that they — they're sort of underground. That, in fact, there is a regime here that depends upon the ability for ATF to trace firearms. They see a firearm. It's on the ground. They want to know who used it. And they have to go back through a tracing. They know who manufactured it. And then they work down to find the perpetrator, the last person who had it. It may be in some cases they trace it back to the person from whom it was stolen. That happens as well. But in all of those cases, that's a useful process for law enforcement and a necessary one and obviously a compelling interest that nobody questions in this case. No one's doubting the government's ability to regulate firearms in that way. But I just want to also point out, because these are obviously — what makes these questions difficult is that they're sort of unbounded. I mean, the question of scrutiny is a tough question in any case when you're applying it. The government's view of this particular case, I think there are issues that the court can and should reach before you reach that question of scrutiny that are, in the government's view, far simpler. This is — the defendant is the master of his challenge here. And he surely could have adduced a factual record that would — let's, for example, say the government was arresting an unlawful alien in his home and found a firearm that was in a case under the couch or lock. We would be in a vastly different situation here. And arguably there, you know, then we would be talking about law-abiding. We might be talking more about the people. There are no facts here. And so at most, there is either nothing or there are facts harmful for him. And his position is that the court should ignore those facts because he chose to plead. And so I think the government's point here is if the court either — either passes that issue or agrees with him on it, it is, in effect, permitting a facial challenge where he acknowledges one is not permissible. So I think the court can reach those questions and — Kagan. A facial challenge is not permissible because — Because no — as far as I'm aware, no court has permitted a facial challenge to a — on a Second Amendment grounds, particularly where — even where courts have hinted that one might be available, it's only where the conviction of the — that particular defendant itself violates the Second Amendment, and then the court sort of expands that analysis outward. So — and we cite some cases in our brief on that point. The Fourth Circuit in Carpio Leon also talks about — and Jimenez talks about this as well — the law-abidingness of the defendant as being separate from the question of his or her membership in the people. The membership in the people is arguably the trickiest question here. It is one of — that relates to historical facts that are simply not in the record, and Mr. Perez didn't raise them. So I believe it was the Tenth Circuit who, when faced with that issue, said, how do you expect us to decide this when you haven't given us the historical record you want us to decide it on? But the Fourth Circuit and Jimenez look at law-abidingness actually as a — as a threshold question about the application of the Second Amendment. And so whereas in Jimenez and here and in Carpio Leon, the defendant is not a law-abiding citizen, and I — I think we're mincing words if we suggest that an unlawful alien is at the same time law-abiding, if the person's not law-abiding, they're not within the scope from the outset. And so I think at that — at that threshold level, we — But one could take different approaches to that, given the — the dimensions of the undocumented community in the United States and, I mean, just the volume of people, number of people, and — So in that sense, they're not law-abiding. But after they got here, they raised their family, they pay their taxes, they pay Social Security, et cetera, et cetera, et cetera. Not Mr. Perez. Well, not Mr. Perez, but I'm talking about — we're talking generally about it. Yeah. And you're using the former to say that they're — they're not law-abiding. I mean, as a general — as a general matter. Is that what you're saying? I think there are — Okay. But here — I mean, and I think this goes back to another threshold question. We have to look at this particular defendant. Correct. And had we been — I mean, I think the proper way to raise this claim would have been for Mr. Perez to go to trial, for him to raise a post-trial motion arguing that this was in violation of his Second Amendment right, and for that to have come to the Court. We haven't suggested that he waived this in sort of a cononis, true waiver sense. What we've argued is that by failing to address his conduct, he has all but acknowledged that the conduct is not within the scope. So it's a slightly different thing — point than he's making. But the — the point here is that all of the facts on which he's relying, even in his reply brief, the length of time in the U.S., his employment status, are utterly unknown. And even when you look at the PSR, assuming we can in this context, it says he may have come to the country — he — he can't tell you where he worked. He can't point to any job sites, any employer. He claims he was a day laborer. He claims he was here consistently. How do we know that? There is no way to know that, and those are facts that are within his control and that are not part of the record. Very good. Thank you. Thank you, Your Honor. Mr. Lee, you have two minutes of rebuttal. So just two very brief points. I don't want to waste anybody's time. First, the — his actual conduct in shooting the gun is irrelevant, as I said, because 922G criminalizes solely the fact of possession. And so any fact beyond that is not relevant to the — to the legal challenge here. The case, Bryant, that the government relies on, the guy who had a gun in connection with drug trafficking, well, that was relevant because that statute was 924C, which criminalized — You have to look at the context in which the gun is possessed and — under — to properly consider the case under Heller. It's not in the home. It's not safely contained, et cetera, et cetera, which I think if it's in there and it's in a — in a — locked in a case or maybe it's available but you have to turn a key so that the kids don't get it and all of that, all the safety precautions are taken care of in the home. It's a different situation than the one we have here. I understand. But our argument is simply that the law that we're challenging is about possession and nothing else, and also that the cases simply don't talk about this. The cases, when they evaluate this — again, there's a guy who pointed a gun at somebody, and they didn't say, well, obviously that's not within the Heller, right? It's — we're just looking at what the law criminalizes, and the law criminalizes mere possession, and that's it. But do you agree that a facial challenge is somewhat problematic in the Second Amendment context? Yes, I do. So we don't — you know, certainly — We're not pressing. We're not pressing a facial challenge. And then just the last point I would like to make is that, you know, the Second Amendment is a novelty to most of us, but, you know, it's the same right, the people, the same right that they — that undocumented immigrants have under the First Amendment and the Fourth Amendment. And even if this law doesn't shock us, I think a law that said that undocumented immigrants did not have the right to free association or the law that authorized the police to enter the home and to search and rummage through the home of an undocumented immigrant without a search warrant is — that we would find those laws grossly invalid, and that's the same here. All right. Thank you very much. Well argued. We'll take the matter under —